MULLINS, J.
**670 *69 This appeal arises from an action in which the plaintiff, FirstLight Hydro Generating Company, alleged that the defendants, Allan Stewart and Donatella Arpaia, were trespassing on property that the plaintiff owned along the shore of Candlewood Lake (lake). The trial court rendered judgment for the plaintiff in part.[1] On appeal, the defendants claim that (1) there was insufficient evidence to prove the plaintiff's ownership of the subject property, and (2) the trial court abused its discretion by ordering injunctive relief that was overly broad and exceeded the scope of the relief sought by the plaintiff. We conclude that there is sufficient evidence to support the trial court's finding that the plaintiff owned the subject property and, thus, that the trial court properly found that the defendants had trespassed on the plaintiff's property. We further conclude that the scope of the trial court's injunctive relief is not overly broad. Accordingly, we affirm the judgment of the trial court.
The following relevant facts and procedural history are set forth in the trial court's memorandum of decision. "The plaintiff is a public utility corporation with a principal office located in New Milford ... that operates hydroelectric power generation facilities in this state pursuant to licenses from the Federal Energy Regulatory Commission....
"One of the plaintiff's facilities is a pumped storage hydroelectric power facility ... known as the Rocky River development. [The lake], which covers an area of approximately 5650 acres in New Milford, Danbury, **671 New Fairfield, Sherman and Brookfield, serves as the reservoir for the Rocky River [development]....
"The plaintiff's predecessor in interest, the Connecticut Light & Power Company (CL & P), began construction on [the lake] in 1920 and completed it in 1927. CL & P acquired title to the lands forming the bed and shoreline of [the lake] through a series of conveyances during the 1920s and thereafter.... The natural elevation of the ... lake is approximately 200 feet above sea level. When the lake was created, CL & P purchased all of the land constituting the shoreline of the lake sufficient to allow it to raise the water level in the lake by an additional 230 feet. The elevation of approximately 440 feet above sea level, i.e., the maximum height of the lake's surface when completely flooded, was memorialized as part of [a document known as the] '1927 Rocky River datum.' This elevation is ... commonly referred to as the '440 [foot] contour elevation line' or sometimes more simply as the '440 contour.' ...
"In ... 2000, CL & P conveyed all of its right, title, and interest in and to the Rocky River [development] to the plaintiff, then known as Northeast Generation Company, by way of a quit claim deed.... This quit claim deed conveyed all of the land comprising the bed and shoreline of [the lake] ... excepting therefrom prior conveyances *70 from CL & P to other grantees....
"In 1934, CL & P conveyed a portion of the land it had acquired to complete [the lake] and its surrounding shoreline to Oenoke Holding Corporation [by deed].... The 1934 deed describes the eastern and western boundaries of the tract conveyed ... by reference to the '[1927] Rocky River datum more particularly described in an instrument recorded [on page 213 of volume 12] of the New Fairfield land records.' The 1934 deed also delineates the [tract conveyed] by a complete **672 metes and bounds description with reference to permanent surveyors' marks. The 1934 deed also refers to '[a monument on the] 440 [foot] contour elevation line.' ...
"The 1934 deed makes clear that the land conveyed to Oenoke Holding Corporation was, and is, immediately contiguous to the land retained by CL & P along the 440 foot contour elevation line. The 1934 deed also grants to Oenoke Holding Corporation and its successors and assigns rights of use and access to the waters of [the lake]. The ... waters referred to in the 1934 deed cover the adjacent land retained by CL & P at the time of the 1934 conveyance....
"In ... 1961, the Bogus Hill Development Corporation recorded a subdivision map [relating to] a portion of the land deeded to Oenoke Holding Corporation by CL & P.... [L]ots 51 and 52 [of that subdivision] were conveyed to Arthur Namm by warranty deed.... The legal description contained in the deed to Namm describes the southerly boundary [those lots] as running along '[the 440 foot contour elevation line of the 1927] Rocky River datum [and] thence along ... said 440 foot contour elevation line [following a series of specific courses and distances].' The identical metes and bounds description set forth in [this] deed is shown on ... town of New Fairfield map no. 1026....
"Lots 50, 51, and 52 on map no. 1026 were later reconfigured to form, in part, lot 52 and parcel C, as shown on ... town of New Fairfield ... map no. 1903....
"Neither map [no.] 1026 nor map [no.] 1903 delineates the southerly boundary of [these tracts] by reference to 'the 440 contour' or a similar reference. Each map contains the same metes and bounds description contained in the warranty deed from [the] Bogus Hill Development Corporation to Namm....
**673 "The defendants are the owners of a residential parcel of land commonly known as 24 Sunset Drive, New Fairfield.... The defendants' parcel is a waterfront tract that is directly adjacent to the shoreline of [the] lake owned by the plaintiff. The defendants received title to their property by warranty deed from Diana Horowitz....
"The legal description in the defendants' deed describes the land conveyed to them as lot ... 52 and parcel C, as shown and delineated on ... map no. 1903....
"The defendants also received title to a second tract of land, [comprised of] 0.03 acres, as shown on [town of New Fairfield map no. 2580].... The second parcel conveyed to the defendants was land [formally] owned by CL & P, the plaintiff's predecessor in interest, [and is] immediately contiguous to the southerly boundary of lots [51 and 52] as shown on map no. 1026....
"The defendants are the owners of the land and improvements located within the lines of record title, as shown on [a map created by Paul Hiro, a licensed surveyor, that was admitted into evidence as plaintiff's exhibit seven].[2] More specifically, the *71 defendants are the owners of the land ... delineated by the bold lines on said map....
"The plaintiff is the owner of all of the land immediately contiguous to the southerly border of the defendants' land as shown on said map, comprising the shoreline and intertidal zone adjacent to the defendants' property, and the plaintiff is entitled to exclusive possession and control over it....
"In 2013, contractors representing the defendants approached representatives of the plaintiff seeking **674 permission to make improvements to the defendants' property. The defendants required the plaintiff's permission because a portion of the improvements were to be located partially or entirely on the plaintiff's land. The plaintiff granted the defendants permission to install certain improvements, including landscaping, that would be built on the plaintiff's land by way of a permit dated December 6, 2013.... The defendants signed the December 6, 2013 permit, thereby agreeing to the scope of the work allowed and all of the other terms, conditions and limitations of the permit....
"Shortly thereafter, the defendants' representatives again approached the plaintiff seeking permission for additional improvements to be built partially or entirely on the plaintiff's land. The plaintiff granted a second permit to the defendants for the additional work, dated [May] 13, 2014.... Stewart signed the May 13, 2014 permit in July, 2014, thereby agreeing to the scope of the work allowed and all of the other terms, conditions and limitations of the permit....
"Each permit issued by the plaintiff expressly prohibits 'any excavation, flooding, grading or filling except as described' in the permits, and 'construction of any structures, fixtures or improvements except as described' in the permits....
"[Over the course of a year, the plaintiff determined that the defendants were continuously performing work in violation of the permits, even after being warned by the plaintiff to discontinue the work.] On July 30, 2014, Brian Wood, the plaintiff's land management administrator, on behalf of the plaintiff, held an on-site meeting with the defendants. At this meeting, Wood advised the defendants that they had to immediately cease all work on the property because they were constructing a significant portion of it on the plaintiff's land in violation of the permits. Wood advised the defendants that they had **675 to have their property surveyed and the lot lines staked or otherwise marked, and that they had to bring their construction into compliance with the permits. The defendants agreed to obtain [an updated] survey from ... Hiro ... and to cease all further work on the premises....
"The defendants commissioned an updated survey from Hiro, [but did not provide] Wood or any other person representing the plaintiff with a copy of the updated survey....
"Wood visited the site again on September 23, 2014, to review compliance with the permits. Once again, Wood found the defendants' contractors at work on the plaintiff's property. Wood also found on this occasion that extensive additional work had been done on the plaintiff's property in violation of the permits, including the installation of a water fountain." (Footnotes added and omitted.)
The plaintiff subsequently commenced the present action, alleging, inter alia, trespass. The plaintiff sought injunctive relief requiring the defendants to remove all structures from the plaintiff's property *72 that were not authorized by the permits issued to the defendants. At trial, the defendants claimed that the plaintiff could not establish its ownership or possessory interest in the property on which the defendants were building.
After trial, the court concluded as follows: "The court finds that the plaintiff has proven by a preponderance of the evidence that (1) the ... line separating the plaintiff's property and the defendants' property is delineated by the 440 ... contour as originally established by the 1927 Rocky River datum and 1934 deed, and (2) the plaintiff, as successor in interest to [CL & P], is the owner of all of the land immediately contiguous to the southerly boundary of the defendants' property." The trial court further found "that the plaintiff has **676 sustained damages by virtue of the substantial permanent unauthorized improvements constructed by the defendants on the plaintiff's land."
The trial court thereafter issued a permanent mandatory injunction as follows: "1. The defendants are ordered to remove immediately those portions of the following structures that are located partially or entirely on the plaintiff's land shown as being outside the property boundary defined in bold as the '440 contour [elevation] line per ... map no. 1903' and 'property line per ... map no. 2580' [as] depicted on plaintiff's [exhibit seven]:
"a. the upper patio;
"b. the masonry fireplace and hearth;
"c. the masonry retaining wall abutting the upper patio area on the ... lake side of the patio;
"d. the large boulder wall to the southwest of the upper patio and fireplace labeled as 'wall' on plaintiff's [exhibit seven];
"e. the masonry steps to the upper patio area and the masonry steps abutting the retaining wall and upper patio area;
"f. the lower patio;
"g. the masonry retaining wall abutting the lower patio area;
"h. all conduit, utility lines, electric fixtures and lines, high and low voltage lighting, drains and irrigation equipment;
"i. the block wall to the west ... of the house; and
"j. the hot tub.
**677 "2. The defendants shall immediately restore the upper patio area to the topography grades shown on [a survey map dated September 13, 2012, which was admitted into evidence as defendants' exhibit A].
"3. The defendants shall immediately reduce the masonry retaining wall abutting the lower patio area to [a length of thirty feet].
"4. The defendants shall not take water from or drain water on the plaintiff's land.
"5. The defendants shall not use the planter adjacent to the stone steps and wood deck as a fountain.
"6. The defendants shall not construct any structures on the plaintiff's property as shown on plaintiff's [exhibit seven], the property boundary being defined in bold as the '440 contour [elevation] line per ... map no. 1903' and 'property line per ... map no. 2580' ... on plaintiff's [exhibit seven], except for those allowed by permit from the plaintiff." This appeal followed.
I
The defendants first claim that the trial court incorrectly determined that they were trespassing on the plaintiff's property because there was insufficient evidence *73 to demonstrate that the plaintiff owned the property on which the defendants were building. The plaintiff responds by asserting that the testimony of the experts and the documentary evidence were sufficient to support the trial court's finding that the plaintiff owned the land at issue. We agree with the plaintiff.
We begin by setting forth the standard of review and the relevant principles of law governing the defendants' claim. "[T]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has **678 made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) Miller v. Westport , 268 Conn. 207, 214, 842 A.2d 558 (2004).
"The essentials of an action for trespass are: (1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury." (Internal quotation marks omitted.) Bristol v. Tilcon Minerals, Inc. , 284 Conn. 55, 87, 931 A.2d 237 (2007). The only prong of this test that the defendants challenge in this appeal is the first prong, i.e., that the plaintiff has failed to provide sufficient evidence to prove its ownership or possessory interest in the property.
Specifically, at trial, the defendants asserted that the boundaries of the plaintiff's property, which are described in the 1934 deed conveying a parcel of property to the defendants' predecessor in interest, were ambiguous and that the expert testimony did not resolve that ambiguity. The defendants further assert that the 1934 deed references "the 440 foot contour elevation line of the [1927] Rocky River datum more particularly described in an instrument recorded [on page 213 of volume 12 of] the New Fairfield [l]and [r]ecords," and that the plaintiff's experts did not verify this mark.
This court has held that "the issue [of whether] land [is] included in one or the other chain of title [is] a question of fact for the court to decide." Feuer v. Henderson , 181 Conn. 454, 458, 435 A.2d 1011 (1980). Thus, we conclude that the appropriate scope of review is whether the trial court's findings were clearly erroneous.
**679 See, e.g., Har v. Boreiko , 118 Conn. App. 787, 794-95, 986 A.2d 1072 (2010) (applying clearly erroneous standard of review to trial court's finding of boundary line in action alleging, inter alia, trespass).
"The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole.... A finding of fact is clearly erroneous when there is no evidence in the record to support it ... or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) 24 Leggett Street Ltd. Partnership v. Beacon Industries, Inc. , 239 Conn. 284, 301, 685 A.2d 305 (1996).
"In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported.... This distinction accords with our duty as an *74 appellate tribunal to review, and not to retry, the proceedings of the trial court." (Internal quotation marks omitted.) O'Connor v. Larocque , 302 Conn. 562, 575, 31 A.3d 1 (2011).
In the present case, the trial court had before it a large number of exhibits, including various deeds and maps. The trial court also heard testimony from two expert witnesses, Hiro and Raymond Howard, Jr. On the basis of our review of the trial court's memorandum of decision, we conclude that the key evidence with respect to the plaintiff's ownership of the land was the testimony of these expert witnesses.
"[I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.... The credibility **680 and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible.... On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) Bristol v. Tilcon Minerals, Inc. , supra, 284 Conn. at 65, 931 A.2d 237.
The trial court explained in its memorandum of decision as follows: "Hiro testified at length as to his long experience surveying properties in and around [the] lake, which the court found credible. The court also found his testimony technically sound and found a sufficient basis for his opinion as to ownership of the land immediately contiguous to the defendants' southerly boundary through his reference to all intervening deeds and maps." A review of Hiro's testimony supports the trial court's findings.
Hiro testified that he is a licensed land surveyor in Connecticut and that he has worked for over twenty-seven years as a licensed surveyor. Hiro also testified that he was able to determine the plaintiff's boundary line with "a high degree of confidence...." In particular, Hiro testified as follows:
"[The Plaintiff's Counsel]: [W]hen you do your survey work around [the lake], you tie into [the 1927] Rocky River datum-
"[The Witness]: We do....
"[The Plaintiff's Counsel]: All right. So, that you are able ... to determine, with a high degree of confidence, that you are actually locating the boundary line between an abutter and the [plaintiff's] property?
"[The Witness]: [W]e are, yes.... And, we get a lot of field checks ... when we're doing that, by finding existing ... rivets or ... monuments ... we [go] out there, and we may find a corner or an iron pin ...
**681 or a copper rivet or something right where it's supposed to be, based on ... all our ... computations and our field locations."[3]
*75 Hiro further testified as follows:
"[The Plaintiff's Counsel]: [C]an someone determine where the property boundary is, between their property and [the plaintiff's] property, simply by determining where 440 feet above sea level is?
"[The Witness]: No.
"[The Plaintiff's Counsel]: Why not?
"[The Witness]: [B]ecause ... it changes, it moves.... With construction ... that contour line moves down, but the original deed line is where they were deeded to ....
"[The Plaintiff's Counsel]: And that doesn't move?
"[The Witness]: And that doesn't move." (Emphasis added.)
In its memorandum of decision, the trial court explained that it "also found the testimony of the plaintiff's second expert ... Howard ... credible and sound regarding title to the land immediately contiguous to the defendants' property. The court found that **682 Howard was highly experienced in surveying and cataloguing titles for CL & P, especially those involved in CL & P's hydroelectric projects." Howard testified that he is a licensed land surveyor in Connecticut, Massachusetts, and New York, and has worked as a licensed land surveyor since 1991. He also testified that he had worked as a surveyor for Northeast Utilities, a sister company of CL & P, performing various surveying work until his departure to start his own surveying business in 2007. After he started his own business, he performed various surveying work for the plaintiff.
The trial court summarized Howard's testimony as follows: "Howard testified that he reviewed the same primary sources, i.e., deeds, surveys and permanent monuments, as Hiro, and field verified the 440 foot contour elevation [line] as having the same metes and bounds described by Hiro. The court found Howard well qualified to express an opinion as to (1) the location of the original 440 foot [contour elevation line], and (2) title to the land on both sides of the 440 foot [contour elevation line]. The court accepts Howard's testimony that further verification of the 440 foot contour elevation [line] described in the 1934 deed is unnecessary in that it has been verified many times by other surveyors around [the] lake." (Internal quotation marks omitted.)
A review of the testimony at trial demonstrates that the trial court reasonably relied on Howard's testimony. At trial, Howard testified as follows:
"[The Defendants' Counsel]: But you haven't gone back to certify where the property line is vis-à-vis the original deed ... even though it's easy to do?
"[The Witness]: No, it's not easy to do, it's a lot of work.
"[The Defendants' Counsel]: [M]aybe that's why people haven't done it, it's a lot of work, okay?
**683 "[The Witness]: Some don't, but the good ones do.
"[The Defendants' Counsel]: Okay.... But it can be done?
"[The Witness]: Oh, yeah....
"[The Defendants' Counsel]: [I]f somebody asked you to do it, you would do it?
"[The Witness]: I would do what I've been asked to do, based [on] my license ... I was asked to do a boundary stake out, I reviewed the records, everybody was consistent where that line was, I'm obligated to follow in the footsteps of a surveyor, [and] there's no reason to doubt where that line was....
*76 "[The Defendants' Counsel]: Even though [C. James Osborne, Jr.][4] never referred to it as [the] 440 contour, on his original map? ...
"[The Witness]: At some point a contour is going to have a bearing and distance put on it, and he did. He just happened to be the first one that did it, whether he labeled it the 440 [contour] after that or not is not relevant."
The trial court also relied on documentary evidence in reaching its conclusion. For instance, the trial court explained "the legal description in the defendants' deed makes reference to map no. 2580 when describing the property conveyed to the defendants. Map no. 2580 expressly refers to the southerly boundary of the defendants' property as the '440 contour' and indicates that the land south of that border is land owned by [CL & P]." These maps and deeds identifying the boundaries of the defendants' property therefore provide further evidence to support the trial court's finding that the **684 plaintiff owned the property on which the defendants were building.
The defendants assert, however, that the trial court incorrectly relied on deeds for the defendants' property to establish the boundaries of the plaintiff's property. We disagree. First, as we have explained previously in this opinion, the trial court's finding was based primarily on the testimony of the plaintiff's experts, whom the trial court found to be credible. Second, it is undisputed that CL & P originally owned all of the land in this area and quitclaimed to the plaintiff all of the land it had not conveyed to others previously; therefore, demonstrating what land previously had been conveyed to others, including the defendants, may be useful in establishing the property currently owned by the plaintiff. Third, reliance on the deeds of one landowner to establish the boundaries of an adjoining landowner's property is not improper as a matter of law. See, e.g., Barca v. Mongillo , 133 Conn. 374, 376, 51 A.2d 598 (1947) (relying, in part, on language in defendant's deed showing common boundary to establish plaintiff's ownership of abutting land in action for trespass); cf. Velsmid v. Nelson , 175 Conn. 221, 227-28, 397 A.2d 113 (1978) (relying on fixed monuments of adjoining property owner to establish boundary line). Thus, the trial court's reliance on deeds for the defendants' property was not incorrect, especially when those deeds incorporated documents referencing the plaintiff's ownership of the property immediately contiguous to the defendants' property.
After a careful review of the record, we conclude that the trial court's finding that the plaintiff owned the land on which the defendants had trespassed is supported by sufficient evidence in the record and is, therefore, not clearly erroneous. As previously mentioned in this opinion, the defendants do not challenge the trial court's findings as to any of the other elements **685 of trespass. Accordingly, we conclude that the trial court properly found that the defendants were trespassing on the plaintiff's property.
II
The defendants also contend that the trial court abused its discretion by ordering injunctive relief that was overly broad and exceeded the scope of the relief sought by the plaintiff. Specifically, the defendants assert that two of the structures *77 that the trial court ordered the defendants to remove-namely, the lower patio and the adjacent retaining wall-were allowed under the permits previously issued by the plaintiff.
For the reasons that follow, consistent with the parties' representations at oral argument before this court, we conclude that the trial court's order must be read so as to require the defendants to remove the lower patio and the adjacent retaining wall only to the extent that they are currently not in compliance with the original permits and then to allow the defendants to rebuild those structures in a manner that complies with those permits.
We begin by setting forth the appropriate standard of review. "The issuance of an injunction and the scope and quantum of injunctive relief rests in the sound discretion of the trier." (Internal quotation marks omitted.) Cummings v. Tripp , 204 Conn. 67, 90, 527 A.2d 230 (1987). "[T]he court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Internal quotation marks omitted.) Walton v. New Hartford , 223 Conn. 155, 165, 612 A.2d 1153 (1992).
At trial, the plaintiff introduced a permit dated May 13, 2014, memorializing an agreement between the plaintiff and the defendants. In particular, this permit **686 allowed, inter alia, the defendants to construct a "[l]evel [s]itting [a]rea" that is 30 feet in length by 20 feet in width and made of gravel or peastone and a stone retaining wall around that area.
As stated previously in this opinion, after finding that the defendants had trespassed, the trial court issued an injunction requiring, inter alia, the defendants to remove immediately several specifically enumerated structures "that are located partially or entirely on the plaintiff's land shown as being outside the property boundary defined in bold as the '440 contour [elevation] line per ... map no. 1903' and 'property line per ... map no. 2580' [as] depicted on plaintiff's [exhibit seven]...." These structures included "the lower patio" and "the masonry retaining wall abutting the lower patio area...."
At oral argument before this court, the following colloquy occurred between the court and counsel for the plaintiff:
"The Court: So you read the order as the court telling the defendants to cut the retaining wall by ten feet, because it's ten feet too long, and take the patio and basically remove it, and you can have it as a gravel sitting area twenty [feet] by thirty [feet]....
"[The Plaintiff's Counsel]: I think essentially that's right. I don't read it as granting the defendants any sort of affirmative relief about what they can do.... The court just said remove the patio that wasn't permitted and ... you should conform to the permit in the future, and any further trespasses are enjoined.... So I think the court was entirely consistent with what the permit allowed, [and] whether the defendants can [bring an action] for some sort of affirmative relief under the permit in the future [is] for another day.
"The Court: It sounds like, at least with respect to that issue, there wouldn't be a need to do that if ...
**687 they agree with you about what the order requires them to do. That is, not take down the entire structure, but just to change it, put it back to what it was, or what's permitted under the permit.
"[The Plaintiff's Counsel]: Yah, I wouldn't say they violated the injunction by keeping a peastone or gravel sitting area there.... That would not be a violation of the injunction.
*78 "The Court: As long as it's thirty feet-
"[The Plaintiff's Counsel]: Yah, as long as it's the proper size, correct. And the retaining wall, obviously, just needs to be reduced according to the judge's instructions."
Likewise, at oral argument before this court, the following colloquy occurred between the court and counsel for the defendants:
"The Court: [O]bviously, your view is that there is no trespass at all, at least with respect to the plaintiff. But if we disagree with you and ... we get to the second issue about the lower patio and [the abutting] retaining wall, in light of what [the plaintiff's counsel] said, is there really an issue anymore?
"[The Defendants' Counsel]: Oh, I think there is, because, quite honestly, if you look at ... closing arguments, which are ... part of the record, [the plaintiff] keeps changing ... what [its] looking for....
"The Court: Well, whatever they were looking for at trial, or before today, if you want to call it a concession, you heard [the plaintiff's counsel], based on what he said, if we were to include that in an opinion, what's left of that aspect of this controversy?
"[The Defendants' Counsel]: Very little ... I'll agree with you, Your Honor."
**688 After a review of the judgment of the trial court and the record before the trial court, including the May 13, 2014 permit authorizing the defendants to build the lower patio and abutting retaining wall, we agree with counsel for both parties that the injunctive relief must not be read to require complete removal of these structures. Rather, consistent with the representations of the parties at oral argument before this court, we conclude that the injunction requires the defendants (1) to remove the lower level patio, which had been constructed with pavers, and rebuild it, if they elect to do so, as a gravel or peastone sitting area, and (2) to remove the portions of the abutting retaining wall that exceed the size allowed by the permit. Accordingly, we conclude that the injunctive relief ordered by the trial court was proper.[5]
The judgment is affirmed.
In this opinion the other justices concurred.

The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

This map is dated September 10, 2012, and was revised by Hiro to reflect certain changes on March 7, 2013, August 20, 2014, and September 9, 2014.

The defendants argue that the trial court incorrectly relied on Hiro's testimony because he did not verify the boundary by referring to the 1927 Rocky River datum, which was referred to in the 1934 deed. The trial court explained its reliance on Hiro's testimony as follows: "Hiro ... testified that verifying the 1927 Rocky River datum by field locating it was unnecessary because it had been fixed by reference to permanent markers, which are still in existence, and identified by metes and bounds at the time it was established. Hiro also testified that in his experience the original permanently marked boundary line has been recognized as such ever since. Hiro then testified that it would not be possible for the actual field contour of 440 feet above sea level to serve as the property line because it would constantly be changing due to weather, construction along the waterfronts, and other causes." On the basis of the foregoing, we conclude that the trial court reasonably relied on Hiro's testimony.

C. James Osborne, Jr., a licensed surveyor, conducted a survey of the defendants' property in 1978, and was the author map no. 1903, upon which Hiro relied when determining the property lines in the present case.

In its brief on appeal to this court, the plaintiff also asserted the following arguments: (1) the defendants' claim regarding the injunctive relief is unreviewable because they did not plead permitting as a special defense; (2) the defendants' claim regarding the injunctive relief is unreviewable because it is unpreserved; (3) the defendants have no permit because they have not satisfied a condition of the permit; and (4) no permit was issued for the lower patio or retaining wall in their current condition. On the basis of the representations made by the plaintiff's counsel at oral argument before this court, we consider these claims abandoned and understand the plaintiff to agree that the injunctive relief ordered by the trial court must be read so as to allow the defendants to maintain a lower level sitting area and retaining wall in accordance with the permit dated May 13, 2014.